# BRANDT

## VS.

## THE CITY OF WESTMINSTER COLORADO

Deposition

### ERIC PATRICK BRANDT

*10/27/2015*

*Agren Blando Court Reporting & Video, Inc.*
216 16th Street, Suite 600
Denver Colorado, 80202
303-296-0017



EXHIBIT A

*Agren Blando Court Reporting & Video, Inc.*

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 1:14-cv-02994-WYD-NYW

---

VIDEO DEPOSITION OF ERIC PATRICK BRANDT
October 27, 2015

---

ERIC BRANDT,

Plaintiff,

vs.

THE CITY OF WESTMINSTER, COLORADO,
a municipality; MAYOR HERB ATCHISON,
in his official and individual capacity;
WESTMINSTER POLICE OFFICER PAUL E. NEWTON,
in his official and individual capacity,

Defendants.

---

APPEARANCES:

KILLMER, LANE & NEWMAN, LLP
By David A. Lane, Esq.
1543 Champa Street, Suite 400
Denver, Colorado 80202
Telephone: (303) 571-1000
Fax:       (303) 571-1001
dlane@kln-law.com
Appearing on behalf of Plaintiff

## Page 2

1  APPEARANCES (continued):
2  SENTER GOLDFARB & RICE, L.L.C.
       By Thomas S. Rice, Esq.
3      3900 East Mexico Avenue, Suite 700
       Denver, Colorado 80210
4      Telephone: (303) 320-0509
       Fax:       (303) 320-0210
5      trice@sgrllc.com
       Appearing on behalf of Defendant
6      City of Westminster and
       Mayor Herb Atchison
7
   BERG HILL GREENLEAF & RUSCITTI, LLP
8      By Josh A. Marks, Esq.
       1712 Pearl Street
9      Boulder, Colorado 80302
       Telephone: (303) 402-1600
10     jam@bhgrlaw.com
       Appearing on behalf of
11     Defendant Paul E. Newton
12  Also Present: David R. Frankel
                  Kristopher W. Scott, CLVS
13                Rusty, the dog
14
15         Pursuant to Amended Notice, and the Federal
16  Rules of Civil Procedure, the video deposition of
17  ERIC PATRICK BRANDT, called by the Defendants, was taken
18  on Tuesday, October 27, 2015, commencing at 9:18 a.m.,
19  at the 3900 East Mexico Avenue, Suite 700, Denver,
20  Colorado 80210, before Patricia S. Newton, Registered
21  Professional Reporter and Notary Public within and for
22  the State of Colorado.
23
24
25

## Page 3

```
 1                     I N D E X
 2  VIDEO DEPOSITION OF ERIC PATRICK BRANDT
    Examination by                          PAGE
 3
       Mr. Rice                              5
 4     Mr. Marks                            75
 5  EXHIBITS                    INITIAL REFERENCE
 6  Exhibit 1   11/4/14 Complaint            7
 7  Exhibit 2   3/16/15 Supplement to       31
                Scheduling Order [DOC. 16]
 8
    Exhibit 3   9/11/15 Plaintiff's Responses 63
 9              to Defendant Paul E. Newton's
                First Set of Discovery
10              Requests; Certificate of
                Service, Verification
11
    Exhibit 4   8/20/14 e-mail to Hilary    24
12              Graham from Eric Brandt
                (Bates Nos. Westminster.
13              Brandt000324-000325)
14  Exhibit 5   Color copy of photograph of 81
                Mr. Brandt holding a "Fuck
15              Cops" sign
16  Exhibit 6   Color copy of photograph of 100
                Mr. Brandt
17
    Exhibit 7   Color copy of photograph of 101
18              Mr. Brandt and others
19  Exhibit 8   Color copy of photograph of 103
                Mr. Brandt and officers
20
    Exhibit 9   8/11/14 Westminster Municipal 108
21              Summons and Complaint (Bates
                No. Westminster.Brandt 00025)
22
23
24
25
```

## Page 4

1            P R O C E E D I N G S
2        THE VIDEOGRAPHER: We are on the record at
3   9:18 a.m. Today is October 27th, 2015.
4        This begins the videotaped deposition of
5   Eric Brandt, taken by the defendant in the matter of
6   Eric Brandt versus the City of Westminster, Colorado,
7   et al.
8        We are located at 3900 East Mexico Avenue,
9   Suite 700, Denver, Colorado.
10       The court reporter is Pat Newton. The
11  videographer is myself, Kristopher Scott.
12       Counsel will please introduce themselves,
13  beginning with plaintiff's counsel first.
14       MR. LANE: David Lane on behalf of
15  Eric Brandt.
16       MR. RICE: Tom Rice on behalf of the City
17  of Westminster.
18       MR. MARKS: Josh Marks on behalf of
19  Officer Newton.
20       THE VIDEOGRAPHER: All right. Will our court
21  reporter --
22       MR. RICE: Ms. --
23       THE VIDEOGRAPHER: -- please swear in the
24  witness.
25       MR. RICE: Ms. Newton, if you will give the

Page 5

1 oath to the witness, please.
2     THE REPORTER: Mr. Brandt, please raise your
3 right hand for the oath.
4     ERIC PATRICK BRANDT,
5 being first duly affirmed in the above cause, was
6 examined and testified as follows:
7     EXAMINATION
8 BY MR. RICE:
9   Q  Good morning, sir. For the record, would you
10 tell us your full legal name.
11   A  Eric Patrick Brandt.
12   Q  Okay. And spell the last name.
13   A  Bravo, Romeo, Alpha, Nancy, Delta, Tango.
14   Q  What's your date of birth?
15   A  November 19, 1971.
16   Q  Do you have a residence address?
17   A  I have a mailing address of Post Office Box
18 133, Westminster, Colorado 80036, although I prefer
19 correspondence to go through my legal counsel.
20     And I am currently occupying the Lindsey-
21 Flanigan Courthouse at 520 West Colfax, where we have
22 been for 64 days.
23   Q  Okay. All right. So when you say you have a
24 mailing address, that's where you receive mail?
25   A  Yes.

Page 6

1   Q  But I take it from your comments that you do
2 not have a permanent residence address, then?
3   A  My -- my residency listed with the Adams
4 County Clerk and Recorder is in the area of 72nd and
5 Federal Avenue.
6   Q  And that's the way it's listed?
7   A  Yes.
8   Q  Okay. All right. Then you said that you're
9 currently a resident at the Lindsey-Flanigan Courthouse?
10   A  Yes. We've been protesting against police
11 misconduct and -- and prosecutorial misconduct at the
12 Lindsey-Flanigan Courthouse for 64 days.
13   Q  Okay. So you're -- you're sleeping where:
14 in the courtyard?
15   A  On the street, yeah, at -- yeah, on Colfax
16 Avenue.
17   Q  Okay. There's a plaza there between the
18 jail --
19   A  Yes.
20   Q  -- and the courthouse.
21   A  Right.
22   Q  Is that where you're talking about?
23   A  Uh-huh.
24   Q  "Yes"?
25   A  Yes.

Page 7

1     (Exhibit 1 was marked.)
2   Q  (By Mr. Rice) Okay. Let me first hand you
3 what I've marked as Exhibit No. 1. And Exhibit No. 1 is
4 a copy of the Complaint that was filed on your behalf in
5 the lawsuit that brings us here today.
6   A  Yes.
7   Q  You've seen this before?
8   A  I have.
9   Q  All right. And if you look at paragraph 2
10 that commences on page 1, it says, in introductory
11 fashion, that the plaintiff brings this action for
12 constitutional injuries he sustained on August 11, 2014,
13 when he was permitted to address the Westminster City
14 Council in a speech regarding a matter of great public
15 concern, and then it set out with dashes public -- or,
16 excuse me -- "police abuses in Westminster, was cut
17 short by the Defendant Mayor who ordered the Defendant
18 Officer to arrest Plaintiff Brandt because he objected
19 to the content of Mr. Brandt's message."
20   A  Correct.
21   Q  All right. Now, that's a summary statement,
22 but that's the gist of the -- the controversy that
23 brings us here today, correct?
24   A  That's the nexus point, yes.
25   Q  All right. So what triggered the lawsuit

Page 8

1 that you and I are here talking about today was your
2 attempt to address the Westminster Cou- -- City Council
3 on the evening of August 11, 2014?
4   A  That's correct.
5   Q  Why did you choose that date?
6   A  That date was chosen because we had -- we had
7 sort of reached a ceasefire agreement, if you will,
8 where I had stopped carrying my protest sign and had --
9 that had been for about two months, and people in the
10 community came to me and they started saying that they
11 -- they thought that I had been paid into silence or
12 that they took my sign away, and I -- I couldn't let my
13 friends and neighbors think that they could be purchased
14 or beaten into silence.
15     And before going back to the street with my
16 sign, I wanted to address the city council politely and
17 advise them of what my next steps were going to be so
18 that we could potentially move forward amicably.
19   Q  Okay. And so that there was some reason for
20 that specific date, then?
21   A  The specific date wasn't -- wasn't selected;
22 it's just that that was the next city council meeting
23 night that was -- that was available to me after I made
24 my decision to do that.
25   Q  I see. And do you know how many times a

Page 9

1 month the Westminster City Council holds public
2 meetings?
3   A   I believe they meet on the second and fourth
4 Monday nights of each month.
5   Q   All right. And you know that as a part of
6 those meetings, there's a "Public Comments" section?
7   A   Correct.
8   Q   And that's true at each one of the meetings,
9 right?
10  A   Each one of those meetings, yeah.
11  Q   Yes.
12  A   I don't know if a work meeting qualifies, but
13 at these meetings, yes.
14  Q   No, but the public meetings that you
15 reference that are held on the second and fourth
16 Mondays, those are the ones we're talking about?
17  A   Correct.
18  Q   All right. And so it was your intent to
19 speak at the August 11, 2014, city council meeting in
20 the "Public Comments" section?
21  A   Correct.
22  Q   What was the subject matter that you intended
23 to speak about on August 11, 2014?
24  A   The subject matter was essentially police
25 misconduct, a history of police misconduct with

Page 10

1 Westminster. And, also, I wanted to address specific
2 misconduct that I had been observing against the area
3 homeless people.
4   Q   Okay. And did you prepare remarks; that is
5 to say, did you have a speech prepared in advance?
6   A   I prepared a speech that I had tested out to
7 be approximately eight minutes in length.
8   Q   All right. And was it written out?
9   A   I -- I did have it written out, yes.
10  Q   In -- in longhand or typed out?
11  A   I had typed it.
12  Q   Uh-huh. On what medium was it typed?
13  A   It was typed electronically on a standard
14 word-producing application on a standard computer.
15  Q   What computer?
16  A   I don't remember.
17  Q   And do you remember what it was saved to?
18  A   It was probably saved in Microsoft Word
19 format. I don't remember.
20  Q   But what I'm -- what I'm wondering is what
21 storage device it was saved to.
22  A   I had saved it to my laptop, which I no
23 longer possess.
24  Q   All right. Now -- and if I get the jargon
25 wrong, then you'll, I'm sure, correct me, but I refer to

Page 11

1 it as a C drive. It's a local hard drive on a laptop
2 typically.
3   A   I -- I would presume typically I would have
4 saved it on a local hard drive, yes.
5   Q   Okay. On your laptop?
6   A   Yes.
7   Q   All right. What was the laptop you were
8 using at or about that date, August 11, 2014?
9   A   I -- it was a -- I think it was an HP laptop.
10 I don't remember specifically.
11  Q   And did you own it?
12  A   Yes.
13  Q   Do you know what model it was?
14  A   No.
15  Q   Does it still exist?
16  A   It may exist in a landfill or a scrap yard.
17 I don't know where it's at.
18  Q   Okay. How did it come to leave your
19 possession?
20  A   I don't remember.
21  Q   All right. So in any event, in advance of
22 the August 11, 2014, meeting, you composed remarks that
23 you intended to deliver?
24  A   Yes, I did.
25  Q   And did you write it out verbatim?

Page 12

1   A   I'm sorry?
2   Q   All right. I'll be happy --
3   A   I wrote a speech and I printed it out and I
4 took the printed copy to the city council meeting to
5 read.
6   Q   All right. Let me -- let me just clarify
7 something for you here. If for whatever reason I choose
8 words that either are not clear to you or you don't
9 understand, all you've got to do is tell me that and
10 I'll be happy to clarify.
11      So when I say "verbatim," what I mean is that
12 you wrote out the entirety of the remarks you intended
13 to deliver?
14  A   Oh, I wrote it out and I practiced it, yes.
15  Q   Okay. And -- and I assume you did some
16 editing?
17  A   Naturally.
18  Q   Yeah. I mean, you worked --
19  A   I'm not sure where we're going with this.
20  Q   You --
21  A   It doesn't really seem very relevant. I
22 wrote a speech to deliver to the -- to my government.
23  Q   And you worked on it over a period of time?
24  A   Yeah, over a few days.
25  Q   All right. And -- and were others allowed to

Agren Blando Court Reporting & Video, Inc.

### Page 13

1  review and comment?
2  A    Sure. But I don't know what the relevance
3  is.
4  Q    Well, that -- that's not for you to decide,
5  okay? So can you tell me if others --
6       MR. LANE: He's right.
7  Q    (By Mr. Rice) -- if others were allowed to
8  review and comment?
9  A    Sure.
10 Q    And who were they?
11 A    I know that David Rockwell did. I had a
12 couple friends and neighbors that did. Specifically who
13 did, I -- I --
14      James Hornoff did. He -- he was prepared to
15 give up his five-minute slot for me to finish my speech
16 because it was longer than five minutes.
17 Q    Okay. Who -- who is David Rockwell?
18 A    David Rockwell is the public defender for the
19 City of Westminster.
20 Q    Okay. And he was then representing you on
21 some criminal matters?
22 A    I -- no. At that moment in time, actually he
23 had withdrawn as counsel to be con- -- to have conflict
24 counsel assigned where he signed an affidavit claiming
25 that the City of Westminster, through the city attorney

### Page 14

1  and through the city prosecutor, had a vendetta to get
2  me out of town.
3  Q    Okay. So at that particular point in time,
4  Mr. Rockwell had withdrawn as your legal representative?
5  A    I think by that time, he had withdrawn.
6  If -- if it wasn't by that date, it was within -- it was
7  about that same time.
8  Q    Okay. But prior thereto, he had been your
9  legal representative?
10 A    He had been, yeah.
11 Q    Okay. And then who is James Hornoff?
12 A    He's a -- was my neighbor at the time.
13 Q    And a friend?
14 A    Yes.
15 Q    All right. So then you practiced the speech?
16 A    Yes.
17 Q    Which means to say that you actually stood
18 someplace and -- and gave the speech out loud?
19 A    Yes.
20 Q    How many times did you practice it?
21 A    I -- I forgot to keep a spreadsheet on that.
22 I don't remember --
23 Q    Okay. Well --
24 A    -- but might have.
25 Q    Well, I -- do you remember?

### Page 15

1  A    At least half a dozen.
2  Q    Okay. All right. And then before you went
3  to the city council meeting on August 11, 2014, you
4  actually printed out the text of the speech you intended
5  to --
6  A    I did.
7  Q    -- deliver? All right.
8       And took that with you?
9  A    Yes.
10 Q    All right. And did I understand you to say
11 earlier that when you practiced it, you found it to run
12 roughly eight minutes in length?
13 A    Yes.
14 Q    Do you know what became of the -- the hard
15 copy that you'd printed out?
16 A    No.
17 Q    To your knowledge, does it exist today?
18 A    If I don't know what became of it, then to my
19 knowledge, I could not possibly know that it exists
20 today.
21 Q    Okay. All right. Now, at the August 11,
22 2014, meeting, you were recognized and allowed to begin
23 your speech, right?
24 A    Yes.
25 Q    All right. And then at some point in -- in

### Page 16

1  your remarks, the mayor started to ask you a question,
2  right?
3  A    Most specifically, I introduced myself and
4  advised that the board -- that I had a speech that would
5  run approximately eight minutes in length and that
6  Mr. Hornoff was going to give up his five minutes for me
7  to finish my eight-minute speech.
8       And Mr. Atchison, the mayor, told me that no
9  one gives up time for anyone else. "You have five
10 minutes and that's it. Go ahead and begin your speech."
11 Q    All right. Then, at some point in time, the
12 mayor asked you a question, right?
13 A    62 seconds into my polite attorney-approved
14 speech on police brutality in Westminster, the mayor
15 interrupted me and asked me where I was going with my
16 speech.
17 Q    The -- the mayor said, "Mr. Brandt, are you
18 going to be saying anything at all connected with your
19 lawsuit" -- "pending lawsuit?"
20 A    Correct, he said that.
21 Q    All right. Did you answer his question?
22 A    I did not answer his question. I advised him
23 that I had the microphone. This is the public
24 microphone. It's very clear that his is to listen and
25 mine is to speak.

Page 17

1   Q   Okay.
2   A   I advised him not to use up my five minutes.
3   Q   Why did you not answer his question?
4   A   Because I did not need to answer his
5   question. His question was out of order.
6   Q   It was true that as of August 11, 2014, you
7   had served upon the City of Westminster a series of
8   documents that were captioned as "Notice of Intent to
9   File Legal Proceedings," correct?
10  A   Correct.
11  Q   Specifically, you had served three such
12  notices dated January 29, 2014, that were said to
13  concern events that occurred respectively on August 5,
14  2013, August 6, 2013, and September 12, 2013, correct?
15  A   Correct.
16  Q   You had also served a Notice of Intent dated
17  April 5, 2014?
18  A   Okay.
19  Q   Is that true?
20  A   I'll take your word for that, yeah.
21  Q   You had also served a Notice of Intent dated
22  June 12, 2014?
23  A   Yes.
24  Q   And you had also served a Notice of Intent
25  dated July 24, 2014?

Page 18

1   A   I'll -- the dates are probably approximately
2   correct, yes.
3   Q   All right. So you -- you would agree with me
4   that as of the time that you were delivering your
5   remarks to the city council on August 11, 2014, you had
6   served six different Notices of Intent to file legal
7   proceedings against the City?
8   A   I -- I had a number of communications with
9   the City, or attempted communications with the City, to
10  elicit from them the desired response of correcting
11  their problems, which they flatly ignored.
12  Q   Yeah, but -- but my question is a little more
13  specific than that, all right?
14  A   I filed a number of Notices of Intent to file
15  a claim, yes.
16  Q   And do you agree with me, there were six?
17  A   There were probably about six, yeah.
18  Q   Okay. Now, when you refused to answer the
19  mayor's question --
20  A   I didn't refuse; I declined.
21  Q   Okay. Fair enough. When you declined to
22  answer the mayor's question, he eventually asked you to
23  stand down, right?
24  A   He did.
25  Q   He said, "I'm going to ask you to stop."

Page 19

1   A   He said, "I'm going to ask....," yes. When
2   is he going to do it?
3   Q   Uh-huh. But he said, "I'm going to ask you
4   to stop." That's what he said, right?
5   A   Sure.
6   Q   All right. Did you stop?
7   A   Absolutely not.
8   Q   Why not?
9   A   Because I have the right to address my
10  government. And my government, which, for two and a
11  half years, had -- at this point three years -- had
12  proved to be deaf to fine writing and eloquence,
13  absolutely he was not going to shut me up at a public
14  meeting.
15  Q   Okay.
16  A   We've had hundreds of years to learn this
17  lesson. He should have learned it a long time ago.
18  Q   Now, there was also a police officer who
19  became involved, right?
20  A   Yes.
21  Q   And that would be Officer Newton?
22  A   Yes.
23  Q   Had you had any prior contact with
24  Officer Newton?
25  A   I had numerous interactions with Officer

Page 20

1   Newton and found him never to be anything but
2   contemptuous and abusive.
3   Q   All right. So the answer is that you had had
4   prior contact with Officer Newton?
5   A   Yes.
6   Q   All right. And I'll table that. Mr. Marks,
7   who is representing Officer Newton, I'm sure he'll have
8   some more questions about that, but I'll -- I'll move on
9   from there right now.
10      At -- at the meeting on August 11, 2014,
11  Officer Newton also asked you to stand down, right?
12  A   Yes.
13  Q   All right. Did you do so?
14  A   It is not unlawful to decline an unlawful
15  order. No, I did not.
16  Q   All right. And -- and why did you not
17  respond to the officer's request that you stand down?
18  A   Well, most of us learned to count to one at
19  a very young age, and I don't think we need to count
20  farther than the First Amendment. I have the right to
21  address my government and seek redress. That was the
22  appropriate time to do it, and it was improper,
23  inappropriate, illegal, unlawful, and utterly immoral
24  for them to attempt to silence my speech.
25  Q   And thereafter you were arrested by

Page 21

1  Officer Newton?
2  A   I was.
3  Q   You were taken to jail?
4  A   Absolutely.
5  Q   Which jail?
6  A   Adams County Detention Center.
7  Q   Okay. Which is out in Brighton?
8  A   It is.
9  Q   Had you ever been there before?
10 A   Many times.
11 Q   How long -- and I'm talking now about in --
12 in the aftermath of your arrest on August 11, 2014, how
13 long were you at the jail?
14 A   I believe I was in jail for two days.
15 Q   Okay. So that means you would have been
16 released, then, on the 13th?
17 A   I would have had -- I would have to check the
18 jail records to recall specifically.
19 Q   All right. But the -- your -- your best
20 recollection is roughly two days?
21 A   Yes.
22 Q   And how were you released: on a recognizance
23 bond?
24 A   I believe I was released on a recognizance
25 bond.

Page 22

1      You'll forgive me. My protesting activities
2  have elicited dozens of arrests, and I don't necessarily
3  recall the specific details of that particular date.
4  Q   Yeah, there's no problem. That's another
5  thing that, you know, is part and parcel of the
6  deposition process --
7  A   Uh-huh.
8  Q   -- is that many times the attorney will ask a
9  question that the deponent doesn't know an answer to.
10 And so all you have to do is tell me, okay?
11 A   Okay.
12 Q   And it's certainly fair game for you to do
13 that, all right?
14     All right. Then, the charges that found you
15 being arrested on August 11, 2014, were eventually
16 dismissed, right?
17 A   They were dismissed on August 25th --
18 Q   All right.
19 A   -- although I was not told about it until
20 November or December.
21 Q   But -- but two weeks later, on August 25th,
22 2014, those charges were dismissed?
23 A   They were.
24 Q   All right. Now, you then spoke at the
25 August 25th, 2014, city council meeting of the

Page 23

1  Westminster City Council, correct?
2  A   I did.
3  Q   Were you invited to attend and speak?
4  A   We discussed it with the city attorney, and I
5  don't remember his name at the time, but his predecessor
6  and -- and so, yes, the mayor invited me to complete my
7  speech at that time.
8  Q   Okay. When you say "we" discussed, who is
9  that?
10 A   It was Hilary Graham, myself, and the then
11 city attorney, and I -- I -- his name escapes me.
12 Q   All right. Let me suggest the name of
13 Mr. McCullough.
14 A   That's him.
15 Q   All right. That's the gentleman you're
16 talking about?
17 A   Yeah.
18 Q   All right. So there was a conversation
19 between you, Hilary Graham, who is an assistant city
20 attorney, right?
21 A   Uh-huh.
22 Q   "Yes"?
23 A   Yes.
24 Q   And then -- and then Mr. McCullough?
25 A   Yes.

Page 24

1      (Exhibit 4 was marked.)
2  Q   (By Mr. Rice) All right. Let me hand you
3  what I've marked as Exhibit No. 4. Exhibit 4 is an
4  e-mail that you wrote to Ms. Graham on August 20 of
5  2014, correct?
6  A   Yes.
7  Q   And -- and does this e-mail, at least in
8  part, concern those discussions about you being invited
9  to attend the city council meeting?
10 A   Yes.
11 Q   All right. So what I want to do is, I want
12 to find out what exactly was discussed. What -- what --
13 what was the communication that -- that you had with the
14 City that resulted in your being invited to speak on
15 August 28th?
16 A   Well --
17 Q   Or, excuse me, I -- I said the date wrong.
18 August 25th.
19 A   Yeah, and I -- I understood what you meant.
20     In our discussion, it was very clear from
21 Ms. Graham and Mr. McCullough --
22     Is that how it's pronounced?
23 Q   Yes.
24 A   -- that the City was in fact at fault and
25 that they would -- and that part of my demand was that I

Page 89

1 relates to the mayor opening up and inviting people to
2 the public microphone and then my taking the microphone
3 and delivering my speech, the interruption, the arrest,
4 that portion is really the only portion that I've
5 listened to with any degree of -- of attention. And --
6 and I've listened to it many times, and I would say that
7 it's very accurate.
8 Q Okay. In other words, you don't --
9 A The rest of the meeting, I can't speak to.
10 Q Sure. Of course. Of course. All right.
11 And I don't want to take you through a
12 blow-by-blow recitation of, you know, every statement
13 that was said during your public comments session, but
14 as I've listened to it, it sounds to me like you -- you
15 started off giving your presentation, and the mayor at
16 some point interrupts you and asks you if your comments
17 are related to your lawsuit with the City.
18 A Yes. It's -- I believe he specifically said
19 that he needed to interrupt me for a second and he
20 needed to know if my comments that night would be in any
21 way related to my pending lawsuit against the City of
22 Westminster.
23 Q Right. Right. And I think you already --
24 you were already asked earlier whether -- why -- whether
25 you responded to that, you already responded that --

Page 90

1 A Uh-huh.
2 Q -- you didn't respond to it, you kept -- you
3 kept reading.
4 A I did respond to him. I responded to him by
5 reminding him that he -- what his position was: that
6 he's not to interrupt my five minutes.
7 Q Correct. And -- and -- and your -- it sounds
8 like your thought process at the time was that the mayor
9 didn't have any right to interrupt you, right, you had
10 the floor?
11 A My thought process remains that the mayor had
12 no right to interrupt me.
13 Q Okay. And then the mayor asks you a couple
14 times to stop your presentation after that, doesn't he?
15 A He does.
16 Q Okay. And you kept right on reading?
17 A Absolutely.
18 Q Okay. And then after those two requests, the
19 mayor asks you to remove yourself from the podium,
20 didn't he?
21 A I don't recall that he asked me to remove
22 myself from the podium.
23 Q Or remove yourself from the stand, I believe.
24 A Maybe I should have refreshed my memory and
25 listened to that again. And if we need to take a break

Page 91

1 to do that, then I would be willing to do that, but --
2 Q Well, let me ask you: If it's on the audio
3 recording, you wouldn't dispute that, would you?
4 A I wouldn't dispute it if it was on the audio
5 recording.
6 Q Okay. And at -- at some point, doesn't
7 Officer Newton come down to the podium area from
8 somewhere else in -- in the room?
9 A Yeah. So, again, if we're looking at the
10 glass -- the baptismal font that I'm calling it -- then
11 there are several rows of seating. There's another row
12 of seating along the side, kind of in a dark area.
13 There's a large alley -- a large alley, and then there's
14 an alley and a presentation area, and then there's the
15 council up here. And the lectern for public speaking is
16 over here on the left side. It would be the northeast
17 corner of the room.
18 And the mayor interrupted me. I told -- I
19 encouraged him not to use up my five minutes and I
20 continued speaking.
21 And then he starts asking again. He's
22 gaveling, he's raised his voice.
23 And at this point, what's going through my
24 mind is that I -- I pretty much knew in my mind at that
25 moment that I was going to be taken into custody because

Page 92

1 I was absolutely not going to stop delivering my speech.
2 Q Were --
3 A The mayor is gaveling, he's being loud. I
4 raised my voice to speak over him so people could still
5 hear me. And at this point, I'm literally reading the
6 words off of my page because I'm no longer engaged in
7 the presentation, my mind is watching the room. And
8 what I'm observing is, I'm observing a bunch of Boy
9 Scouts that are just kind of, you know, looking, they're
10 -- they're looking, they're paying attention.
11 I see the mothers in the room are looking for
12 exits. They're looking around the room. They're kind
13 of, you know, grabbing -- they're thinking, "What are
14 we" -- "how am I going to get these kids out of here?"
15 is -- is what they appeared to me.
16 And I'm looking -- and the men in the room
17 looked like they're preparing to come up to the fight,
18 and I'm paying attention to this. My awareness is
19 fairly heightened to what -- what I think is going to be
20 the pending struggle.
21 And I can see Officer Newton in my periphery
22 coming down this west side aisleway. So he's coming
23 down kind of around and to the -- behind and side of me.
24 I'm looking for Mr. Barnes, who has since
25 passed away -- he was a private investigator that was

### Page 93

1  helping me at the time -- and James Hornoff, who were --
2  I think they were in the front row just maybe 5 feet
3  away from me. I'm looking at them to see how they're
4  responding. I'm reasonably certain that I'm going to be
5  taken into custody at that point.
6     Q    Let me stop you there.
7          Prior to seeing Officer Newton out of your
8  peripheral vision, did you happen to know what he was
9  doing while you were reading your presentation?
10    A    I don't recall seeing him anywhere other than
11 back by the -- what I'm referring to as the baptismal
12 font.
13    Q    So -- so back in the rear of the city
14 council?
15    A    I know it's not a baptismal font, but you
16 know what I mean.
17    Q    You mean to the rear of the city council
18 chambers?
19    A    Yes.
20    Q    Okay. And as I understand it, when you come
21 up to the podium and you're doing your presentation,
22 your back would be to that part of the -- right?
23    A    I would say from -- from an angle on that,
24 that the lectern is -- is maybe 20 degrees turned at the
25 most. So peripherally, you might be able to see.

### Page 94

1          But my -- I wasn't focused on my periphery at
2  that time.
3     Q    Okay.
4     A    But I -- I don't recall seeing him anywhere
5  other than that general location until --
6          Well, when the mayor asked me to stop and I'm
7  raising my voice, at that point it -- he's -- he's also
8  apparently keenly aware of what the next step is and
9  he's moving down the aisle at that point.
10    Q    "He" being Officer Newton?
11    A    Correct.
12    Q    Did you see the mayor make any hand gestures
13 to Off- -- to someone in the back of the room, like --
14 like, to come forward or something to that effect?
15    A    I definitely remember seeing the mayor have
16 eye contact with Newton and follow him part of the way
17 down. I don't recall if there were hand gestures.
18 If -- if they were there, I didn't notice them, or
19 perhaps I was looking at other parts of the room.
20         I was -- I was also analyzing what might be
21 going on in other parts of the room. I -- I know that
22 -- I was aware that Officer Newton was coming down
23 behind me. I was aware that the mayor was in eye
24 contact with him.
25    Q    Okay.

### Page 95

1     A    I think that every reasonable agent in the
2  room realized that there's going to be a struggle.
3     Q    Okay. Do you recall whether Officer Newton
4  asked the mayor if he wanted you removed as you're
5  reading your presentation?
6     A    I recall that he came down and was kind of
7  beside me between the people. And -- and I remember him
8  looking at the mayor several times and them being in eye
9  contact.
10    Q    Do you remember any words?
11    A    I don't think he said anything.
12    Q    Yeah, that's what I was asking.
13    A    And I apologize on that, too, and we might
14 have to analyze the audio more clearly.
15         I am hard of hearing, and both the mayor and
16 I were being loud and -- and I -- I don't recall him
17 saying anything --
18    Q    So it's possible --
19    A    -- or if he mouthed anything.
20    Q    Okay. So it's possible that there could have
21 been a verbal exchange, and you either were
22 concentrating on your presentation or because of your
23 hearing, you might not have heard it?
24    A    I'm reasonably confident that there was some
25 sort of communication, be it verbal or nonverbal.

### Page 96

1     Q    Okay.
2     A    I think that both of them were aware that
3  they were working in tandem on something.
4     Q    Okay. And shortly after that point, does
5  Officer Newton ask you to leave?
6     A    He advises me that the mayor has asked me to
7  leave.
8     Q    Okay. Okay. And did you take that as kind
9  of an indirect request for you to leave?
10    A    Yeah, I think -- I think that that's an
11 indirect request. I think that's a passive -- you know,
12 it's a transitive -- it's a transitive from the mayor.
13         There's a period where, you know, Officer
14 Newton is there and he placed his hands right behind me.
15 I don't remember if he actually grabbed me or he just
16 touched me.
17         And then the mayor says that -- that -- that
18 I can leave or I can go outside but that I have to stop
19 my testimony.
20    Q    Okay. And -- and I take it at that point,
21 you keep reading your testimony?
22    A    Yeah. I paused when -- when Newton put his
23 hands on me. And then the -- the mayor makes that
24 statement, and then I continued my speech.
25    Q    Okay. And do you recall whether Officer